IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Valerie Kean Staab,                          :
                              Petitioner     :
                                             :
            v.                               :    No. 1354 C.D. 2024
                                             :    Submitted: July 7, 2025
State Ethics Commission,                     :
                              Respondent     :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE MATTHEW S. WOLF, Judge
           HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION BY
PRESIDENT JUDGE COHN JUBELIRER          FILED:  December 8, 2025


        Valerie Kean Staab (Kean Staab), pro se, petitions for review of a Final
Adjudication by the State Ethics Commission (Commission), which found her in
violation of various provisions of the Public Official and Employee Ethics Act, 65
Pa.C.S. §§ 1101-1113 (Ethics Act).  On appeal, Kean Staab argues the Commission's
findings that she received a pecuniary benefit when she was reimbursed by the North
and South Shenango Joint Municipal Authority (Authority), in her role as a member
of the Board of Directors (Board), for expenses she and her guests incurred while
attending conferences are not supported by substantial evidence.  Kean Staab further
argues such reimbursement was not unlawful as it was authorized by the Authority and
did not constitute a pecuniary benefit or a conflict of interest.  Lastly, she argues the
Commission's finding that she filed incomplete Statements of Financial Interests
(SFIs) is not supported by substantial evidence and that the penalty for the SFIs was
unreasonable.  Upon review, we conclude that (1) the Board could not authorize

reimbursement for the types of expenses that Kean Staab claimed and (2) but for expenses related to a guest at one conference, the Commission's findings related to expense reimbursements and the SFIs are supported by substantial evidence and constitute a conflict of interest. Accordingly, we affirm as modified herein.

## I.     BACKGROUND

As a member of the Authority's Board, Kean Staab is subject to the Ethics Act.[1] Following notice and an investigation, the Commission's Investigative Division filed an Investigative Complaint/Findings Report (Investigative Complaint) in September 2022 charging Kean Staab for alleged violations of the conflict-of-interest and SFI provisions of Sections 1103(a), 1104(a), 1105(b)(4), and 1105(b)(8) of the Ethics Act, 65 Pa.C.S. §§ 1103(a), 1104(a), 1105(b)(4), and 1105(b)(8). The Commission alleged Kean Staab, in her role as a Board member, improperly voted to approve paying for guests to attend conferences; charged personal and guest expenses associated with attending conferences to the Authority and/or sought reimbursement for those expenses from the Authority; and approved payments to vendors, credit card issuers, or herself for those expenses.[2] She was also charged with filing deficient SFIs for the calendar years 2016 through 2020. (Certified Record (C.R.) Item 1.)

In response to the Investigative Complaint, Kean Staab, then represented by counsel, filed an Answer with New Matter. (*Id.*, Item 12.) The parties entered into a

---

[1] Kean Staab is also subject to the Ethics Act as an auditor with the Pennsylvania Department of the Auditor General (Department). The Commission's Investigative Division also charged Kean Staab with not using leave and receiving full wages from the Department while attending conferences as a Board member. The Commission ultimately determined there was insufficient evidence to support this charge. (Final Adjudication at 65.) As that issue is not before this Court, we need not address it further.

[2] It appears other Board members were charged with similar conduct and entered consent orders with the Commission. (Final Adjudication at 60.)

2

proposed consent agreement and stipulation of findings, which the Commission ultimately voted to deny, so a hearing was scheduled. (*Id.*, Items 16-24.)

Over the course of the three-day hearing, at which Kean Staab represented herself, multiple witnesses testified. Pertinent to the issues before the Court, Kathy Haefner, a special investigator with the Investigative Division (Special Investigator), testified as to her investigation, which included obtaining various documents related to Kean Staab's conference attendance and expenses incurred and the Board's approval of payment for same. (Final Adjudication, Finding of Fact (FOF) ¶ 75(c)-(i).)[3] Michael Klink, the former Chair and Manager of the Authority (Manager), testified as to his managerial responsibilities, conference attendance by himself and Board members, and Authority-issued credit cards.[4] Manager testified Kean Staab arranged group dinners for Board members and their guests, and to his knowledge, there was no limit on food or alcohol expenses, which were never questioned by legal counsel or the auditors. (*Id.* ¶ 76(h).) Manager testified the Authority also paid for members' and guests' excursions and tours on such trips. (*Id.* ¶ 76(i).) Manager testified that he and Kean Staab questioned the legality of such expenses in 2014, and after consulting with legal counsel, the Board voted at each reorganization meeting to cover such expenses. (*Id.* ¶ 76(l).) Susan Dvorsky, the former bookkeeper/secretary of the Authority (Bookkeeper/Secretary), testified to assisting with preparing the

---

[3] Special Investigator's testimony is summarized in Finding of Fact 75 of the Final Adjudication, and the full transcript of Special Investigator's testimony appears on pages 32 through 76 of the February 27, 2024 hearing transcript, which is Item 29 of the Certified Record.

[4] Manager's testimony is summarized in Finding of Fact 76, and the full transcript of Manager's testimony appears on pages 191 through 285 of the February 28, 2024 hearing transcript, which is Item 30 of the Certified Record.

financial documents that accompanied the meeting packets for Board members.[5]  In addition, Alan R. Shaddinger, the Authority's former solicitor (Solicitor), testified that the Board voted to pay for travel expenses incurred by Board members and their guests.  (*Id.* ¶ 78(c).)[6]  Solicitor testified he recalled Kean Staab and Manager privately asking him about travel-related expenses and he advised to adopt a formal policy, which was not done until after the public raised concerns about travel expenses and the Authority's credit rating was downgraded.  (*Id.*).[7]  In addition to the testimony, the parties submitted numerous documents into evidence.[8]

Based upon the evidence presented, the Commission issued a comprehensive, 68-page Final Adjudication, finding in pertinent part as follows.  As a Board member, Kean Staab received a monthly meeting packet, which included, among other things, a financial report and list of bills.  (*Id.* ¶ 7.)  At its reorganization meetings in 2017, 2018, and 2019, the Board approved payment of expenses for Board members and their guests to attend general training.  (*Id.* ¶ 10.)  In 2019, at Kean Staab's suggestion, Board members were issued their own Authority credit card if they wanted one, which

---

[5] Bookkeeper/Secretary's testimony is summarized in Finding of Fact 77, and the full transcript of Bookkeeper/Secretary's testimony appears on pages 285 through 305 of the February 28, 2024 hearing transcript.

[6] Solicitor's testimony is summarized in Finding of Fact 79(c), and the full transcript of Solicitor's testimony appears on pages 409 through 456 of the February 29, 2024 hearing transcript, which is Item 31 of the Certified Record.

[7] Before the Commission, Kean Staab argued she should not be subject to restitution or penalties because she relied upon the advice of Solicitor.  The Commission rejected that argument, stating Solicitor did "not provid[e] any reasoned legal advice upon which [Kean Staab] could rely," and "Solicitor [] did not provide 'a written, nonconfidential opinion . . . [that was] publicly stated at an open meeting [of the Authority] and recorded in the official minutes of the meeting' as required by Section 1109(g) of the Ethics Act," 65 Pa.C.S. § 1109(g).  (Final Adjudication at 61-62.)  The Commission also found Section 1109(g) applied only to criminal or treble penalties.  (*Id.* at 62.)  Kean Staab does not challenge these findings before this Court.

[8] Those exhibits are detailed in Findings of Fact 80 through 86.  Copies of Kean Staab's and the Investigative Division's Exhibits appear in the Certified Record as Items 32 and 33, respectively.

4

Kean Staab did. (*Id.* ¶ 13.) In 2020, the Board adopted a formal policy, written by Kean Staab, providing that members would be compensated for mileage at the federal rate, costs related to travel, hotel costs, and meals up to $100 per day for in-state overnight travel and $150 per day for out-of-state overnight travel. (*Id.* ¶ 57.) Before this time, there was no mention of any limits on spending.

There are two conferences that Kean Staab attended that are at issue. The first is the Pennsylvania Municipal Authorities Association's (PMAA) conference held annually in September at various locations throughout Pennsylvania. (*Id.* ¶¶ 14, 16, 18.) Kean Staab attended these conferences from 2016 through 2019 and occasionally brought a guest. (*Id.* ¶¶ 17, 19.) The other conference is the annual Water Environment Federation Technical Exhibition and Conference (WEFTEC). (*Id.* ¶¶ 29-30.) In 2016 and 2018, it was held in New Orleans, and in 2017 and 2019, it was held in Chicago. (*Id.* ¶ 30.) Attendees can register for just the exhibitions or for the entire conference. (*Id.* ¶ 31(a).) Each year, the Authority purchased tickets for its Board members and guests to attend only the exhibitions, which do not open until Monday. (*Id.* ¶¶ 31, 34, 38, 40, 50.) At WEFTEC, Board members and their guests participated in meals and events as a group. (*Id.* ¶¶ 32(a), 33(a).)

Although the exhibitions for which Kean Staab were registered did not open until Monday, Kean Staab arrived on Saturday. (*Id.* ¶¶ 35, 40, 44, 51.) Kean Staab's daughter attended the 2016 WEFTEC with Kean Staab. (Final Adjudication at 44.) Board members and their guests had a group lunch and dinner on Saturday and took a combined swamp/plantation tour on Sunday. (*Id.*; FOF ¶ 37.) Following the conference, Kean Staab requested and received reimbursement for her expenses, including baggage fees for her daughter. (Final Adjudication at 45.) At the 2017 WEFTEC, Kean Staab, other Board members, and their guests attended dinners and

5

events, which were not related to or sponsored by WEFTEC, that were charged to an Authority-issued credit card. (*Id.* at 45-46; FOF ¶ 41.) Kean Staab attended the 2018 WEFTEC accompanied by her daughter, her son, and her son's girlfriend, all of whom stayed in Kean Staab's hotel room. (*Id.* ¶ 46.) Group meals and other events were charged to an Authority-issued credit card. (*Id.* ¶ 47; Final Adjudication at 46.) Kean Staab's brother and his family from Florida visited with Kean Staab and her family, eating with them and going on excursions together. (*Id.* ¶ 48.) At the 2019 WEFTEC, the Authority's group ate dinner at various restaurants. (*Id.* ¶ 53.) Kean Staab also charged for a riverboat and bike tour that were not sponsored by WEFTEC. (Final Adjudication at 47.) She used her Authority-issued credit card for some expenses but did not provide receipts. (*Id.* ¶ 54.) Kean Staab submitted an expense report for other expenses. (*Id.*)

In relation to the SFIs, the Commission found that, although Kean Staab filed amended SFIs for 2016 through 2020, they did not disclose the information required under the Ethics Act. (*Id.* ¶¶ 72-74.)

Based upon its findings, the Commission concluded Kean Staab violated the Ethics Act by participating in Board votes to approve expense-paid attendance by guests at conferences. (Final Adjudication at 53.) In doing so, the Commission explained Kean Staab obtained private pecuniary benefit. (*Id.*) The Commission found Kean Staab's defense that the Board adopted a policy allowing such expenses was "nonsensical," stating "[t]he old idiom of 'the fox guarding the hen house' comes to mind." (*Id.* at 54.)

Regarding the allegation that Kean Staab charged personal expenses to the Authority's credit card, the Commission found some of those expenses were a conflict of interest, whereas others lacked evidentiary support. (*Id.*) Specifically, the

6

Commission found the following charges were improper: hotel upgrade fees; baggage fees for Kean Staab's daughter; expenses incurred as a result of arriving two or more days early for a conference; sightseeing tours and tourist excursions; and meals and other expenses incurred by guests. (*Id.* at 54-55, 57-59.) The Commission found the Investigative Division did not prove, by clear and convincing evidence,[9] the allegations involving: expenses incurred for arriving only one day before a conference; Kean Staab's meals during the conference even if the conference offered complimentary meals or the Authority paid for Kean Staab to attend conference meals; alcoholic beverages; and parking. (*Id.* at 55-58.)

The Commission also determined Kean Staab violated the Ethics Act by voting to approve payments to herself, vendors, and credit card companies for personal expenses that were incurred, citing minutes of Board meetings showing that Kean Staab voted to approve at least nine monthly financial reports, which included personal expenses. (*Id.* at 59.)

Based on the foregoing, the Commission found Kean Staab was responsible for $3,519.83 in restitution.[10] (*Id.* at 63.) The Commission declined to impose treble damages. (*Id.* at 63-64.)

In relation to the SFIs, the Commission explained Kean Staab conceded the violations in her Answer to the Investigative Complaint, and, based on these admissions, the Commission found her in violation of Section 1105(b) of the Ethics Act. (Final Adjudication at 65.) While Kean Staab argued the violations were not

---

[9] Clear and convincing evidence "is evidence that is so clear, direct, weighty, and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts at issue." *G.L. v. State Ethics Comm'n*, 17 A.3d 445, 453 (Pa. Cmwlth. 2011).

[10] The Final Adjudication includes a breakdown of the improper charges on pages 59 and 60.

intentional and had been corrected with the filing of amended SFIs, the Commission found the amended SFIs still did not address all the deficiencies. (*Id.*) For these violations, the Commission imposed five civil penalties of $250 each, which was the maximum permitted by statute.[11] (*Id.* at 66.) The Commission reasoned the maximum was appropriate given "Kean Staab's repeated omission of necessary information each time she filed" an SFI, which, in the Commission's view, "shows a pattern of disregard for the filing requirements." (*Id.*)

Kean Staab sought reconsideration of the Final Adjudication, but the Commission did not act upon it within 30 days and, therefore, dismissed it for lack of jurisdiction. (C.R. Items 42, 45.) Kean Staab filed a timely Petition for Review with this Court.[12]

## II. PARTIES' ARGUMENTS

Before this Court,[13] Kean Staab argues substantial evidence is lacking for many of the Commission's findings and the evidence proffered falls short of the clear and convincing standard. She also asserts several of the factual findings contradict one another.

---

[11] Kean Staab was also charged with filing deficient SFIs in her capacity as an auditor. The Commission, however, declined to impose separate civil penalties in relation to those SFIs, explaining to do so "would amount to a double penalty for essentially the same conduct." (Final Adjudication at 66 n.13.)

[12] By Order dated November 19, 2024, this Court granted Kean Staab's application seeking a stay or supersedeas of the Final Adjudication, which the Commission did not oppose. Thus, the Final Adjudication has been stayed pending disposition of Kean Staab's Petition for Review.

[13] "This [C]ourt's review of a Commission adjudication is limited to a determination of whether constitutional rights have been violated, whether an error of law has been committed, and whether findings of the Commission are supported by substantial evidence." *Russell v. State Ethics Comm'n*, 987 A.2d 835, 838 n.4 (Pa. Cmwlth. 2009).

To the extent the Commission found reimbursement for various activities attended during the conferences was improper, Kean Staab claims she attended less expensive events than those sponsored by the conference hosts, and they provided networking opportunities, so the Authority benefited from her participation. Kean Staab argues reimbursement for meals was a reasonable expense since not all meals were provided at the conferences, and because the total assessed to her was a pro rata portion of the meals for the entire table, the amount assessed against her was not supported by substantial evidence. Although the Board purportedly adopted a policy that would cover guest expenses, Kean Staab asserts any expenses incurred by her daughter that were charged to the Authority's credit card were reimbursed by her daughter's payment of tips or cash.

In addition to the substantial evidence challenge, Kean Staab argues reimbursement for conference expenses was lawfully authorized by the Board, citing Sections 1401(c)(1) and 1402(g)(2) of The Second Class Township Code,[14] 53 P.S. §§ 66401(c)(1), 66402(g)(2), and Section 701.1(c) of the Borough Code, 8 Pa.C.S. § 701.1(c), which provide other municipal bodies with the authority to reimburse members for attendance at conferences. Kean Staab acknowledges the Municipality Authorities Act (MAA), 53 Pa.C.S. §§ 5601-5623, does not expressly provide for reimbursement, as those statutes do, but she asserts it does grant municipal authorities broad power "[t]o do all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority to carry out the powers granted to it." Section 5607(d)(17) of the MAA, 53 Pa.C.S. § 5607(d)(17). Here, Kean Staab argues the Board annually approved paying for each member and one guest to attend conferences and it was not a conflict of interest for members to vote for such a policy.

_____

[14] Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§ 66401(c)(1), 66402(g)(2).

In addition, Kean Staab argues it was error to conclude she used her position for private pecuniary gain. She asserts the evidence does not show her motivation was personal for monetary gain but rather was to obtain education and training and to network. Moreover, any reimbursement provided, Kean Staab maintains, was for reasonable expenses incurred for these purposes, nothing more. Therefore, she did not financially benefit.

Finally, Kean Staab argues the imposition of any penalty related to the SFIs was error as there is no evidence she sought to conceal or misstate information, and any deficiencies were ultimately corrected.

The Commission asserts "Kean Staab repeatedly violated the public's trust by attending conferences as mere pretenses for publicly funded vacations." (Commission's Br. at 15.)[15] It argues substantial evidence exists to support its findings by clear and convincing proof that Kean Staab violated the conflict-of-interest

---

[15] The Commission argues Kean Staab included information in the Reproduced Record that was never entered into evidence, and accordingly, it cannot be considered on appeal. Kean Staab replies that, at the hearing, she inquired about using the investigative materials and understood she was permitted to do so, and that before they could be admitted into evidence, the Commission had to first find a violation occurred. (Kean Staab's Reply Br. at 3 (citing C.R. Item 30, 2/28/24 Tr. at 315-17.)) Our review of the transcript, however, does not support Kean Staab's statement. In response to a question by Kean Staab as to the parties' conflicting views of certain amounts, the Commission's Chair advised Kean Staab of her right to defend herself against both the alleged violation and any amount of potential restitution. (2/28/24 Tr. at 315-17.) The Chair did advise that the parties would have the opportunity to file post-hearing briefs and give closing arguments, but the issue of what was in the investigative file, and how it could be used, was not discussed. (*Id.*) Earlier on the same day, the Chair advised Kean Staab, in response to a question, that if an exhibit was already in the binder of exhibits offered by the Investigative Division, Kean Staab could just reference that exhibit and did not need to separately label and introduce the same exhibit. (*Id.* at 310-11.) The Chair explicitly told Kean Staab "[i]f [she] ha[s] a different document, or if [she] ha[s] an additional document that's related to what's in evidence, [she] may seek to offer it." (*Id.* at 311.) Because it is well established that we cannot consider extra-record evidence on appeal, we will disregard any documents not contained in the Certified Record. *See Paul v. Pa. Pub. Util. Comm'n*, 299 A.3d 1069, 1079 n.10 (Pa. Cmwlth. 2023).

10

provision of the Ethics Act, 65 Pa.C.S. § 1103(a), as well as filed deficient SFIs. It contends "Kean Staab used the authority of her office when she voted as an Authority Board [m]ember to approve payment of out-of-pocket expenses for guests who traveled with Board [m]embers to the conferences." (*Id.* at 17.) It also asserts the evidence shows the Authority paid guest expenses, which Kean Staab subsequently approved. According to the Commission, the evidence also demonstrated Kean Staab obtained direct, private pecuniary benefit by having early travel and sightseeing expenses paid.

The Commission also argues its finding of violations was correct under the law. It contends the violations do not stem from Kean Staab's reimbursement of legitimate expenses, but rather for expenses that were for private pecuniary benefit and were unrelated to the conferences. The Commission contends Kean Staab and the Board cannot circumvent the Ethics Act by adopting internal policies that authorize the reimbursement of expenses that otherwise are ineligible for reimbursement under the law because they violate the Ethics Act.

Finally, the Commission argues the penalty imposed for the deficient SFIs was consistent with law. It points out Kean Staab admitted the violations in her Answer to the Investigative Complaint and she cannot raise new arguments on appeal.

## III.  DISCUSSION

### A.  *Whether reimbursement for the expenses was authorized*

We begin with Kean Staab's second issue, that reimbursement for the expenses was lawfully authorized because, if the reimbursement was lawful, it is unnecessary to determine whether the Commission's findings related to those expenses were supported by substantial evidence.

11

The genesis of Kean Staab's argument is Section 5607(d)(17) of the MAA, which vests a municipal authority with the power

> **[t]o do all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority to carry out the powers granted to it** by this chapter or other law, including, but not limited to, the adoption of reasonable rules and regulations that apply to water and sewer lines located on a property owned or leased by a customer and to refer for prosecution as a summary offense any violation dealing with rules and regulations relating to water and sewer lines located on a property owned or leased by a customer. . . .

53 Pa.C.S. § 5607(d)(17) (emphasis added). This catch-all provision, according to Kean Staab, provided the Board with the authority to annually approve reimbursement for expenses of both Board members and their guests.

A number of statutes governing municipal bodies recognize the importance of providing their members with training and helping them stay informed of the latest developments. Each of those statutes expressly vests the particular body with the authority to pay and/or reimburse for training or conference expenses. For example, The First Class Township Code[16] recommends newly elected township commissioners and certain other township officers attend conferences and educational training "whenever possible." Section 624.2(a) of The First Class Township Code, 53 P.S. § 55624.2(a).[17] If the commissioner or officer presents a certificate of attendance and an itemized account of expenses, he or she is entitled to reimbursement for the registration fee, mileage or actual transportation expenses, and any other expenses authorized by the board of commissioners. 53 P.S. § 55624.2(a)-(b).[18] Expenses to attend meetings

---

[16] Act of June 24, 1931, P.L. 1206, *as amended*, 53 P.S. §§ 55101-58502.

[17] Section 624.2 was added by the Act of October 29, 2020, P.L. 782.

[18] In certain situations, a township employee or commissioner is entitled to compensation for lost wages or salary. *See* 53 P.S. § 55624.2(c).

of the Pennsylvania State Association of Township Commissioners are similarly reimbursable. Section 622 of The First Class Township Code, 53 P.S. § 55622.

In addition, The Second Class Township Code encourages township supervisors and other officials to attend meetings of county associations. 53 P.S. § 66401(b). With proof of attendance and an itemization of expenses, those officials are entitled to payment of $50 per day of attendance,[19] the registration fee, mileage if a personal vehicle is used or reimbursement of actual transportation expense going to and returning from the meeting, as well as other actual expenses that the township's board of supervisors approves. 53 P.S. § 66401(c)(1). The Second Class Township Code caps such reimbursement at no more than two days' attendance per year. 53 P.S. § 66401(c)(4). The Second Class Township Code also authorizes certain officials to attend the Pennsylvania State Association of Township Supervisors (PSATS) and provides for payment of the same types of expenses as with a county association.[20] 53 P.S. § 66402(d), (g). Reimbursement for attending those meetings is limited to four days. 53 P.S. § 66402(g)(4).

Similar to its township counterparts, the Borough Code authorizes borough councils to designate delegates to attend the Pennsylvania State Association of Boroughs' annual meeting and officers or employees to attend conferences, educational training, or committee meetings. 8 Pa.C.S. § 701.1(a)-(b). Upon receipt of an itemized receipt, a council may reimburse for the registration fee, mileage or actual transportation expenses, and any actual expenses council agreed to pay. 8 Pa.C.S. § 701.1(c)(1). A council member is entitled to reimbursement for the above

---

[19] In certain situations, The Second Class Township Code authorizes the reimbursement of lost wages or salary. 53 P.S. § 66401(c)(2)-(3).

[20] A supervisor who serves on the state association's executive committee or a standing committee or is a trustee is, in some situations, entitled to lost wages or salary. 53 P.S. § 66402(j).

expenses, as well as lodging and meals. 8 Pa.C.S. § 701.1(c)(2).[21] Delegates may attend and receive reimbursement for similar expenses incurred for meetings or conferences of other associations or organizations so long as those meetings or conferences are concerned with municipal or governmental affairs. Section 703(a) of the Borough Code, 8 Pa.C.S. § 703(a). Employees or officers who attend professional conferences, meetings, or educational training are entitled to reimbursement for "all or a portion of the necessary expenses incident to an individual's attendance." 8 Pa.C.S. § 703(b). In all circumstances, an itemized account of expenses is required. 8 Pa.C.S. § 703(c).

From these statutes governing townships and boroughs, we are able to glean several common requirements. First, proof of attendance is required. Second, an itemized accounting of any claimed expenses is necessary. Third, registration fees associated with the municipal official's attendance are covered by the township or borough. Fourth, mileage or actual costs of transportation to and from the conference, meeting, or training is reimbursable. Finally, the board or council may approve certain other expenses associated with attendance. Many of the statutes also limit the number of days that are covered.

Unlike these statutes, the MAA, which governs municipal authorities like the Authority, contains **no such express provision** and is otherwise silent on what types of expenses, if any, a municipal authority may cover. However, the catch-all provision in Section 5607(d)(17) of the MAA does provide a municipal authority with the power "[t]o do **all acts and things necessary or convenient for the promotion of its business and the general welfare of the authority** to carry out the powers granted to it by this chapter." 53 Pa.C.S. § 5607(d)(17) (emphasis added). This power is not

---

[21] Similar to the township codes, the Borough Code also authorizes compensation for attendees in certain situations. Section 701.2 of the Borough Code, 8 Pa.C.S. § 701.2.

without limitation, though. Even if an action promotes the municipal authority's business and general welfare, expenses associated with that action must be reasonable. In other words, public officials traveling on the public's dime cannot stay at luxurious hotels and enjoy the finest of dining; they must be cognizant of their expenses. That is because public servants have a duty to preserve the public fisc. *N. Penn Sch. Dist. v. N. Penn Educ. Ass'n*, 58 A.3d 848, 857 (Pa. Cmwlth. 2012) (citation omitted). However, that does not mean a public official must stay in a budget motel and eat from the dollar menu at the nearest fast food restaurant while traveling on official business. One source of reasonable rates is the United States General Services Administration, which provides guidance on per diem rates for states and cities across the country, which are adjusted each fiscal year.[22]

With these principles in mind, we turn to the expenses for which the Commission found Kean Staab liable.[23] The Commission found Kean Staab liable for certain hotel expenses and meal expenses related to herself. These include hotel upgrades, taxes associated with those upgrades, and any lodging fees for arriving on Saturday. (Final Adjudication at 59.) To the extent Kean Staab upgraded to a different room, those upgrades would not be reimbursable as they exceed a standard room fee. For the lodging and meal expenses incurred on Saturdays at the WEFTEC conferences,

---

[22] The United States General Services Administration website is available at https://www.gsa.gov/ (last visited December 8, 2025). The Commission reviewed the 2020 rates for the first and last day of travel in Chicago and New Orleans, where the WEFTEC conferences in question were held, and found the rates were $57 and $76 for Chicago and $53.25 and $71 for New Orleans. (FOF ¶¶ 58-59.)

[23] The Commission found certain expenses of Kean Staab's were allowable. As no one is challenging those findings, we limit our discussion to those that the Commission found were not permitted. In this section, we are also only considering the propriety of the Authority's ability to approve classes of various expenses. Kean Staab separately challenges several of the Commission's findings on the basis they lack substantial evidence. That issue is discussed in section III.C, *infra*.

the Commission found it was reasonable to arrive one day early but not two. (Final Adjudication at 55.) The Commission has reached a similar conclusion in other adjudications. *See, e.g.*, *In Re: Karpa*, Order No. 1552 (State Ethics Comm'n 2010), slip op. at 35-36, 38, 40 (finding expenses related to arrival two days in advance at an event by a school director were not reimbursable). While not bound by the Commission's prior adjudications, we may rely on them when they are persuasive because "[a]s an agency responsible for enforcing and implementing the Ethics Act, the Commission is 'in the best position to interpret' the Ethics Act and its regulations." *Quaglia v. State Ethics Comm'n*, 986 A.2d 974, 979 (Pa. Cmwlth. 2010) (quoting *Tire Jockey Serv., Inc. v. Dep't of Env't. Prot.*, 915 A.2d 1165, 1187 (Pa. 2007)); *see also Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 716 (Pa. 2009) (explaining that courts should afford substantial deference to an agency's interpretation of a statute it is charged with administering).

Given the lack of evidence to justify arriving two days early, we find the Commission's reasoning persuasive. The exhibitions at WEFTEC, the only event for which Kean Staab registered, opened on Monday. (FOF ¶¶ 31(c), 34(a)-(b), 38(a)-(b), 43(a), (c)(1), 50(a), (c)(1).) The events on Saturday and Sunday at WEFTEC required pre-registration, were by invitation only, or were House of Delegates and committee meetings, and there is no evidence Kean Staab pre-registered, was invited, or belonged to the House of Delegates or a committee. (*See, e.g.*, Ex. ID-21 at 10; *see also* FOF ¶¶ 31(b)(1)(aa), 34(b), 38(b), 43(c)(1), 50(c)(1).) Further, although attendees could pick up their badges on Saturday, badges were also available for pickup on the subsequent days. Thus, arriving on Saturday to pick up one's badge was not necessary.

Kean Staab argued she arrived early to network with others, but there is no evidence of record that Kean Staab used that time to network. She did not attend any

of the networking events organized by WEFTEC. Rather, the record reflects she attended various events and activities organized by herself or other Board members and ate meals with other Board members and their guests, including her own. (*See, e.g.*, FOF ¶ 48(b).) Kean Staab argues those activities were less expensive than WEFTEC-sponsored events, and, thus, she was saving the public money. However, that is not the proper measure of what is a permitted expense. As stated above, to be an allowable expense, the authority's business or general welfare must be promoted. Here there is no evidence, aside from Kean Staab's assertions in her brief, that these excursions benefited the Authority in any way. As found by the Commission, the minutes of the Board's meeting are devoid of any discussion by Board members as to any of the conferences. (*Id.* ¶ 75(c)(7)(aa), (d)(3)(aa), (e)(6)(aa), (e)(9)(aa); (f)(4)(aa), (g)(3)(aa), (g)(6)(aa), (h)(5)(aa), (i)(3)(aa), (i)(4)(aa).)

As for meals, the Commission did not find Kean Staab liable for meal expenses she incurred one day before the conferences or during the conferences, even if complimentary meals were provided. (Final Adjudication at 56.) The only meals for which the Commission found Kean Staab responsible were those incurred on Saturday. For the same reasons as above related to lodging charges for Saturdays, charges for meals on those days are outside what the Board had the ability to approve for reimbursement.

The Commission also disallowed any expenses incurred by guests of Board members. Specifically, the Commission found extra baggage fees, meals, and sightseeing tours for Kean Staab's guests could not be charged to the Authority. We agree such expenses are not permitted under the Ethics Act, even if the Board voted otherwise. Notably, **none** of the other statutes governing other municipal bodies provides for expenditures incurred by guests. It is difficult to discern how paying for

17

someone whose only association with a municipal authority is knowing someone who serves on its board promotes the municipal authority's business or general welfare. Such expenses can only benefit an authority member and his or her guest, not the municipal authority itself. Therefore, a municipal authority cannot lawfully agree to pay for **any** of the expenses for guests who travel with a board member.

This approach is also consistent with other Commission decisions. For instance, in *In Re: Eathorne*, Order No. 1451-2 (State Ethics Comm'n 2009), a municipal authority provided members with advances on their expenses for attending conferences, which included the PMAA conference and WEFTEC. The Commission found a municipal authority member used those advancements to pay for, among other things, expenses for his spouse. The municipal authority member also used the authority's credit card to pay for expenses and items of a personal nature for himself and his spouse, including tours unrelated to WEFTEC. *Id.*, slip op. at 89. The Commission rejected an argument that the paid expenses were warranted since board members were not otherwise compensated. *Id.*, slip op. at 95. The Commission held that use of authority funds for a spouse's expenses, either through direct payment to the conference or reimbursement to a board member, was not authorized. *Id.*, slip op. at 97-98.

In another factually similar case, *In Re: Regola*, Order No. 1517 (State Ethics Comm'n 2009), the Commission found a conflict of interest when a member of a municipal authority used authority funds towards personal expenses and expenses related to his wife's attendance at various conferences and seminars, including the PMAA conference and WEFTEC. Like here and like *Eathorne*, the authority member participated in some events outside of official conference ones. *Regola*, slip op. at 11, 13, 16, 19, 22, 36. The authority member also incurred charges for

18

long-distance calls home from the hotel and in-room movies. *Id.*, slip op. at 14-15, 20-21. The Commission found the authority member participated in votes to approve these expenses and obtained private pecuniary gain. *Id.*, slip op. at 45-47, 49-50, 60. *See also In re Krisher*, Order No. 1425 (State Ethics Comm'n 2007), slip op. at 19-20 (holding supervisor used his office and obtained pecuniary gain when the township's credit card was used for personal expenses and for expenses associated with his wife's attendance at the PSATS conference). We find the Commission's prior adjudications persuasive, *Quaglia*, 986 A.2d at 979, and hold that the Board lacked the authority to approve reimbursement of guest attendance at conferences.

In sum, the catch-all provision in the MAA upon which Kean Staab relies does give municipal authority boards power to approve **some** expenses related to a board member's attendance at conferences, but it does not give municipal authority boards carte blanche power to disregard the public fisc.

### B. *Whether Kean Staab's actions constituted a conflict of interest*

Kean Staab also argues that her voting to approve the expenses and obtaining reimbursement for those expenses does not constitute a conflict of interest. Section 1103(a) of the Ethics Act prohibits public officials[24] from "engag[ing] in conduct that

---

[24] "Public official" is defined as:

Any person elected by the public or elected or appointed by a governmental body or an appointed official in the executive, legislative or judicial branch of this Commonwealth or any political subdivision thereof, provided that it shall not include members of advisory boards that have no authority to expend public funds other than reimbursement for personal expense or to otherwise exercise the power of the State or any political subdivision thereof.

**(Footnote continued on next page…)**

19

constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). A "conflict of interest" is defined, in pertinent part, as "[u]se by a public official . . . of the authority of [her] office . . . for the private pecuniary benefit of [her]self [or] a member of [her] immediate family." Section 1102 of the Ethics Act, 65 Pa.C.S. § 1102. It "does not include an action having a *de minimis* economic impact," which is defined as "[a]n economic consequence which has an insignificant effect." *Id.* If a conflict of interest is to arise, the public official is to abstain from voting. Section 1103(j) of the Ethics Act, 65 Pa.C.S. § 1103(j). These principles are consistent with the purpose of the Ethics Act, which is that "public office is a public trust and that **any effort** to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." Section 1101.1(a) of the Ethics Act, 65 Pa.C.S. § 1101.1(a) (emphasis added).

Kean Staab's argument as to the lack of a conflict of interest is twofold. First, she argues there was no intent. Second, she argues there was no pecuniary benefit because she is "in no way richer when [she] left the conferences than [she] was when [she] arrived except for the educational and networking experiences, which benefited the Authority as well." (Kean Staab's Br. at 25.)

Related to Kean Staab's first argument, the Supreme Court in *Kistler v. State Ethics Commission*, 22 A.3d 223 (Pa. 2011), considered whether intent to use one's office for private pecuniary gain is required to find a conflict of interest in violation of the Ethics Act. The Supreme Court acknowledged the Ethics Act was silent on intent, but "the lack of an explicit intent element d[id] not end [its] inquiry" because

---

Section 1102 of the Ethics Act, 65 Pa.C.S. § 1102. A "[p]olitical subdivision" includes "any county, city, borough, incorporated town, township, school district, vocational school, county institution district, and **any authority, entity or body organized by the aforementioned**." *Id.* (emphasis added).

20

the Supreme Court had to "consider the plain meaning of the entire statutory text." *Id.* at 227. Looking to the term "use" in the definition of "conflict of interest," the Supreme Court found the common and approved meaning of "use" "indicates an action directed towards a purpose." *Id.* The Supreme Court further explained that "[s]uch directed action implies awareness on the part of the public official of the potential pecuniary benefit as well as the motivation to obtain that benefit for himself." *Id.* Bolstering this interpretation, the Supreme Court explained, was the use of the term "effort" in the statement of policy in the Ethics Act, which similarly connotes an act towards a goal. *Id.* at 227-28.

The Supreme Court then examined this Court's decisions in *McGuire v. State Ethics Commission*, 657 A.2d 1346 (Pa. Cmwlth. 1995), and *Yocabet v. Pennsylvania State Ethics Commission*, 531 A.2d 536 (Pa. Cmwlth. 1987), which reached opposite conclusions despite the public official in each case receiving excess, unauthorized compensation. In *McGuire*, we held authority board members who did not participate in any action or vote but simply received compensation that **predated** their joining the board did not result in a conflict of interest. Specifically, we held the "[m]ere mistaken acceptance by a public official of a compensation check in an amount that was determined prior to his term in office is devoid of the type of action needed to constitute 'use' of office for the purpose of obtaining personal financial gain." *McGuire*, 657 A.2d at 1351-52. In *Yocabet*, we found a conflict of interest existed where the supervisor voted to appoint himself as secretary/treasurer and accepted compensation beyond that approved by the township auditors. *Yocabet*, 531 A.2d at 538. In reconciling the two cases, we explained that "'use' of public office requires action by a public official that **in some**

21

**way facilitates his receipt of compensation to which he is not entitled**." *McGuire*, 657 A.2d at 1351-52 (emphasis added).

The Supreme Court in *Kistler* also examined two additional decisions by this Court: *Pulice v. State Ethics Commission*, 713 A.2d 161 (Pa. Cmwlth. 1998), and *Rebottini v. State Ethics Commission*, 634 A.2d 743 (Pa. Cmwlth. 1993). In *Pulice*, we held a president of a school board who voted to create a new position, which was ultimately filled by his son-in-law, did not violate the Ethics Act because there was no evidence that, at the time the position was created, it was known who would fill it. 713 A.2d at 164. On the other hand, in *Rebottini*, members of two municipal authority boards were charged with violating the conflict-of-interest provisions in the statute commonly referred to as the Public Official and Employee Ethics Law,[25] a predecessor of the Ethics Act. Specifically, members of one of the boards were charged with creating officer positions and voting to appoint themselves to those newly created positions in order to obtain compensation, which they also set. As to the other board, the officer positions already existed and the members simply participated in votes electing themselves to those positions. Citing Section 7C of the Municipal Authorities Act of 1945,[26] the predecessor of the current MAA, which authorized board members to, among other things, fix and determine the number of officers and their powers, duties, and compensation, as well as appoint those officers, the board members argued the compensation was authorized by law. We agreed with the board members that such compensation to officers was authorized, and the board members were not prohibited from voting either on their own appointment or

---

[25] Act of October 4, 1978, P.L. 883, 65 P.S. §§ 401-413, repealed by Section 6(a)(2) of the Act of October 15, 1998, P.L. 729.

[26] Act of May 2, 1945, P.L. 382, *as amended*, 53 P.S. § 309C, repealed by Section 3 of the Act of June 19, 2001, P.L. 287.

22

their own salaries. *Rebottini*, 634 A.2d at 747. However, for the board members that voted to **create** officer positions in order to obtain compensation, we agreed with the Commission that the board members "created officer positions specifically to circumvent [the statutory] requirement that board member salaries be set by the authority's governing body". *Id.*[27]

Relying on these cases,[28] the Supreme Court held, "to violate the conflict of interest provision . . . , a public official must be consciously aware of a private pecuniary benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit." *Kistler*, 22 A.3d at 223. Importantly, the intent required by precedent is not necessarily the intent to

---

[27] Kean Staab argues *Rebottini* supports her position that no conflict of interest arose here. She asserts if it was permissible for an authority to vote for its compensation there, it follows that the Board here could approve reimbursement for attendance at conferences. (Kean Staab's Br. at 22-23.) Kean Staab's argument is misplaced. First, the holding of *Rebottini* is not as broad as Kean Staab states. The authorities did not set their own compensation for all members; they only set the compensation for officers. Only the governing body possesses the authority to set compensation for a municipal authority's board members. *See* Section 5610(d) of the MAA, 53 Pa.C.S. § 5610(d) (stating authority members "shall receive such salaries as may be determined by the governing body of the municipality"); *Russell v. State Ethics Comm'n*, 987 A.2d 835, 841 (Pa. Cmwlth. 2009) (holding authority member's vote in favor of additional compensation for purportedly attending separate meetings that were held immediately one after the other was outside the authority's power and constituted a conflict of interest). Second, in *Rebottini*, the power to set the compensation for officers was expressly provided by statute, whereas the MAA is silent as to reimbursement for attending training and conferences. Third, as discussed above, *Rebottini* found one authority's actions in approving the compensation for officers was not a conflict of interest because the officer positions already existed. However, the other authority, which created the officer positions, voted to appoint themselves to those positions and set compensation for officers, **did** engage in a conflict of interest. As discussed more fully below, the actions of the Board here are more akin to the latter municipal authority in *Rebottini*.

[28] The *Kistler* Court also examined our decision in *Snyder v. State Ethics Commission*, 686 A.2d 843, 849 (Pa. Cmwlth. 1996), in which we found a supervisor who participated in deliberations about and voted to approve two private development projects while simultaneously seeking to secure masonry work for the same projects created a conflict of interest.

23

knowingly violate the Ethics Act. Rather, it is to **obtain pecuniary gain** through the use of one's office or position.

In the instant matter, but for Kean Staab being a Board member, she would not have been in a position to obtain reimbursement for these expenses. It is undisputed that Kean Staab voted in favor of the reimbursements both at the annual reorganization meetings, when the Authority's Board approved a practice to pay such expenses for members and their guests, and at the Board's monthly meetings, when it voted to approve the actual expenses incurred as part of the financial report and bills.[29] Kean Staab's act of voting in favor of reimbursing Board members for their and their guests' expenses and for voting to approve those expenses when presented for payment was with the intent that she (and other Board members) would obtain reimbursement for same. This act of voting in support of the motions is a "directed action [that] implies awareness" on Kean Staab's part "of the potential pecuniary benefit as well as the motivation to obtain that benefit for h[er]self." *Kistler*, 22 A.3d at 227. Kean Staab intended to be reimbursed for those expenses, whether or not she knew that conduct violated the Ethics Act. Or in *Kistler*'s parlance, Kean Staab was "consciously aware of a private pecuniary benefit for [her]self [and her] family," and took "action in the form of one or more specific steps to attain that benefit," *i.e.*, voting in the motions' favor. *Id.* at 231. Therefore, with her positive votes, Kean Staab used her position in public office to "facilitate[] h[er] receipt of compensation to which [s]he [wa]s not entitled." *McGuire*, 657 A.2d at 1351-52.

---

[29] In at least one instance, Kean Staab actually made the motion to reimburse Board members for out-of-pocket expenses incurred by Board members and their guests related to training. (Ex. R-6, 1/10/18 Meeting Minutes.)

This is not a case like *McGuire* where the practice of reimbursement predated Kean Staab's role on the Board and Kean Staab passively accepted such reimbursement. Nor is it like *Pulice* because, at the time of voting in favor of the reimbursement motions, Kean Staab knew she would benefit from those motions. Rather, this case is more akin to the municipal authority board in *Rebettini* that created officer positions, appointed themselves to those positions, and fixed the rate of compensation for officers in that the Board here approved the practice of reimbursement for members and their guests to attend conferences and then benefited from that same practice.

Kean Staab also argues neither she nor her family obtained any pecuniary benefit as they were simply reimbursed, dollar for dollar, for their expenses associated with the conferences. However, as discussed above, Kean Staab was not entitled to reimbursement for some of those expenses. Therefore, Kean Staab received a financial benefit, *i.e.*, payment for expenses to which she was not otherwise entitled.

### C.     *Whether the Commission's findings are supported by substantial evidence*

Having determined what types of expenses are not subject to reimbursement and constituted a conflict of interest when Kean Staab voted to approve them, we turn to whether there is substantial evidence to support certain findings that Kean Staab challenges. "Substantial evidence is such relevant evidence as a reasonable person would consider adequate to support a finding." *Bouch v. State Ethics Comm'n*, 848 A.2d 1078, 1080 (Pa. Cmwlth. 2004). Importantly, "[t]he existence of conflicting evidence does not mean the evidence relied on is not substantial." *Id.* Further, if there is substantial evidence, we "must then consider whether all the facts found by the

Commission are clear and convincing proof that the public official violated the Ethics Act." *Id.* Finally, it is the function of the Commission, not this Court, to weigh evidence and evaluate a witness's credibility. *Id*.

Kean Staab argues several of the Commission's findings lack substantial evidence and/or contradict one another. The first relates to which conferences Kean Staab brought guests and what charges were attributable to those guests. Specifically, Kean Staab argues the Commission, on page 53 of the Final Adjudication, stated that Kean Staab's daughter accompanied her to the 2016 PMAA conference and the 2016 through 2019 WEFTECs, and that for the 2016 PMAA conference, Kean Staab was charged a $150 nightly upgrade fee for her daughter. However, Kean Staab asserts that Findings of Fact 43 through 48 only mention her daughter attending the 2018 WEFTEC, and none of the findings identify any other guest of Kean Staab's. Kean Staab concedes her daughter attended the 2016 and 2018 WEFTECs, but no others. (Kean Staab's Br. at 9.) Therefore, Kean Staab maintains any charges related to guests outside of the 2016 and 2018 WEFTECs should be reversed.

Dealing first with the hotel upgrade fee and related taxes at the 2016 PMAA conference, the Commission acknowledges a factual error in its Final Adjudication but claims it is harmless error because Kean Staab still received an upgrade to her hotel for which she was not entitled; it just was not the result of her daughter staying with her. (Commission's Br. at 7.) While not ideal, we agree any error in identifying the reason behind the upgrade ultimately is harmless, as Kean Staab does not appear to dispute that the upgrade occurred. Moreover, there is record evidence to support the finding that Kean Staab was assessed charges for upgrades during the 2016 PMAA conference. Exhibit ID-4 is an invoice from the Wyndham Grand for Kean Staab showing an upgrade on August 28-30, 2016. (C.R. Item 33; *see also* Transcript (Tr.) at 50.)

26

Relatedly, Kean Staab argues she did not request the upgrade and was not involved in booking the hotels. However, this argument is unpersuasive. Manager testified he did not make every hotel reservation and that Kean Staab or Bookkeeper/Secretary may have used Manager's Authority credit card, with his knowledge, to make reservations. (Tr. at 207.) He further testified that he and Kean Staab would select hotels and he would not reserve rooms without her input. (*Id.* at 281.) Kean Staab admitted in her sworn statement to helping Manager select the hotels. (Ex. 10-47 at 62.) Further, she told investigators that she always ordered a king-size bed. (*Id.* at 63.) Moreover, regardless of who made the reservations, Kean Staab had the ability, if not the duty as a member of the Authority's Board, to review charges and ensure their accuracy before voting to approve them.[30] Yet Kean Staab admitted no one reviewed the bills or questioned expenses, even if they did not know why, for whom, or for what purpose the expenses were incurred. (*Id.* at 123.) Had the Board done so, any errant charges could have been addressed in a timely manner. Although the Commission may have made conflicting statements and findings about the 2016 PMAA conference and attributed the upgrade to Kean Staab's daughter, the record evidence is sufficient to show Kean Staab received and was charged for a room upgrade, which was not a permitted expense.

As for Kean Staab's claim that the Commission found no one other than Kean Staab's daughter attended any conferences as her guest, we disagree. In Finding of Fact 46, the Commission found Kean Staab's daughter, son, and son's girlfriend attended the 2018 WEFTEC. However, the Commission found Kean Staab also liable for some charges incurred by a guest at the 2017 WEFTEC, specifically dinner on Saturday and some sightseeing events on Saturday and Sunday. However, there are

---

[30] Manager testified the bills were placed on the table at Board meetings for review, along with checks for the Board to sign. (Tr. at 204, 230-31.)

no findings that Kean Staab invited a guest to the 2017 WEFTEC in Chicago, nor is there any reference to guests of Kean Staab attending the 2017 WEFTEC in the discussion section of the Final Adjudication. Thus, to the extent the Commission assessed a pro rata share of the dinner charges ($85.06), Navy Pier events and rides ($15), and Get Your Guide tickets ($39.95) to Kean Staab for a guest, we agree with Kean Staab that there is no substantial evidence to support these findings. Therefore, the Commission's Final Adjudication is modified to reduce the amount of restitution owed by $140.01, which reflects the amount of those items.[31]

We reach a different conclusion about the 2019 WEFTEC. At the hearing, Kean Staab confirmed Marcel Groen[32] was a guest who attended group dinners at the 2019 WEFTEC, as did Manager. (Tr. at 274.) At the hearing, the following exchange took place between Kean Staab and Manager:

> [Kean Staab]. Okay. Thank you. He went to dinner with us several times in Chicago. Is that true?
>
> [Manager]. Yes.
>
> [Kean Staab]. But we didn't pay for his flight?
>
> [Manager]. No.
>
> [Kean Staab]. Do [sic] we pay anything besides dinner?
>
> [Manager]. Not that I'm aware of.

---

[31] Kean Staab contends that because the Commission allotted certain costs on a pro rata basis, those findings necessarily lack substantial evidence to show she was actually responsible for the amount allotted. As many of the charges incurred were not broken down and not separately billed, we cannot fault the Commission for the lack of individual bills when the Authority members failed to request them. The Commission has done so in other final adjudications, s*ee Regola*, slip op. at 29, 31-32, 37-38 (dividing charges among attendees of dinner), and we conclude that approach is reasonable here for purposes of assessing a group's charges on an individual basis.

[32] Kean Staab appears to have recommended Groen to assist the Authority with some bond issues in 2008 and 2018. (Tr. at 274.)

(*Id.* at 275.)  Thus, the meal charges for a guest at the 2019 WEFTEC are supported by substantial evidence.[33]

The remaining charges for guests occurred at the 2016 and 2018 WEFTECs, which Kean Staab admits guests attended.  However, Kean Staab alleges her guests paid cash that was used towards tips and/or subsequently reimbursed the Authority for any expenses they incurred.  The Commission, though, made no such finding and instead found those charges were either charged directly to an Authority credit card or paid using Kean Staab's personal credit card, for which she subsequently sought and received reimbursement after the Board, including herself, voted to approve the payments.[34]  (Final Adjudication at 59.)  For support, Kean Staab cites Manager's testimony and her daughter's bank statements showing cash withdrawals in New Orleans.[35]  Neither, though, establishes her daughter paid the Authority for her expenses.  The mere fact that Kean Staab's daughter may have withdrawn money while

---

[33] The only charges attributable to a guest for the 2019 WEFTEC were lunch and dinner on Saturday.  (Final Adjudication at 60.)  There were charges assessed against Kean Staab for excursions, namely, a Seadog Ventures cruise and Navy Pier bicycle rental, but those were for Kean Staab personally.  (*Id.*)

[34] In some instances, instead of paying Kean Staab directly, Kean Staab directed the Authority to issue payment directly to the issuer of her personal credit card.  (*See, e.g.*, FOF ¶ 39(a); Exs. ID-9 at 10 (Oct. 2016 financial report showing payment of $790.52 to Kean Staab's personal credit card issuer), ID-11 at 2 (November 2016 statement for Kean Staab's personal credit card reflecting same payment), ID-47 at 58-59h (sworn statement by Kean Staab explaining the Authority "[u]sually [] would pay my credit card actually"), ID-49 (October 2016 email from Kean Staab to Manager listing expenses for conference and requesting check be mailed directly to her personal credit card issuer), ID-50 (copy of check issued to her personal credit card issuer with envelope addressed to same); Tr. at 249 (Kean Staab confirming with Manager that she sometimes asked that reimbursement be sent directly to her personal credit card issuer).)  Kean Staab also stated in her sworn statement that she did not provide receipts for some credit card charges because the monthly statement "told you what [the charge] was."  (ID-47 at 127.)

[35] Kean Staab also cites to statements by her children to this effect.  However, as explained in footnote 15, *supra*, those statements are not part of the certified record and, therefore, we cannot consider them.

in New Orleans with her mother does not establish that the Authority received that money. (Ex. R-11.) Manager did not recall whether the daughter paid cash toward the group bill. (Tr. at 260, 262-63.) Nor does the fact that Manager recalled Kean Staab's children paying for their own flights support that the children also paid for their meals and excursions. (*Id.* at 262.) Moreover, even if there was evidence to support Kean Staab's guests providing reimbursement, "[t]he existence of conflicting evidence does not mean the evidence relied on is not substantial." *Bouch*, 848 A.2d at 1080. Ultimately, it is the Commission's function to resolve such conflicts. *Id.*

Next, Kean Staab argues the Commission's findings related to early arrivals at WEFTEC contradict one another. She argues, on the one hand, the Commission found arriving on Saturday was improper because the exhibitions for which Kean Staab was registered did not open until Monday, but on the other hand, the Commission found the WEFTECs ran Saturday through Wednesday and included many preconference events, workshops, luncheons, receptions, and networking activities. Moreover, Kean Staab asserts there is no evidence she was the person responsible for determining arrival dates, and Manager testified travel arrangements were discussed and coordinated among all Board members attending. (Tr. at 281-82.) Finally, she contends she attended networking events on Saturday and did register and attend Sunday events but does not provide any record cites to support this claim.

The brochure for WEFTEC does show events on Saturday; in fact, the brochure lists some events on Friday. (Ex. ID-21 at 10.) However, there is no evidence Kean Staab attended any of those events, nor is there any evidence that she was permitted to do so. Friday consisted of registration for exhibitors and presenters, and Kean Staab was neither. Saturday also consisted of registration and certain other activities that required registration or invitation. Kean Staab was only registered for the exhibitions,

30

which opened on Monday, and there is no indication that she was invited to any of the closed events. While registration was available both days, it was also available on Sunday, the day the Commission found would have been reasonable for Kean Staab to arrive for activities scheduled for the next day. The Commission's findings on this point are not contradictory. Rather, they illustrate the Commission's finding that, at the earliest, Kean Staab should not have arrived for any WEFTEC until Sunday – one day, not two days, before the exhibitions for which she was registered opened. Moreover, while Kean Staab contends she was not responsible for determining arrival dates, in her sworn statement, she told investigators she "normally was the person making the flights." (Ex. ID-47 at 60.) Therefore, her attempt to disclaim responsibility for travel plans is not persuasive.

Kean Staab also challenges the Commission's finding that she was liable for meals associated with attending WEFTEC when the Commission also found that meals were not always provided. Kean Staab overstates the Commission's finding in this regard. The Commission did not find Kean Staab liable for any meals incurred for herself the day before or during the convention. The only meals that the Commission assessed against Kean Staab were the lunches and dinners incurred by her early arrivals on Saturday. As discussed above, those expenses are not covered expenses.[36]

In sum, the findings of the Commission that Kean Staab challenges are supported by substantial evidence, except for the findings related to any guests'

---

[36] Kean Staab argues the Commission did not take into account that she reimbursed the Authority in January 2022. The Commission, though, could not take this into account as it occurred after the hearings and record closed in this matter. Accordingly, any such evidence is not part of the certified record, so we cannot consider it. *See* note 15, *supra*. However, if Kean Staab did make payment to the Authority for such expenses after the proceedings before the Commission, those payments should be applied towards the restitution she owes.

attendance at the 2017 WEFTEC. The Final Adjudication is modified as to those charges, reducing the amount of restitution by $140.01.

### D.    Whether the SFIs were deficient

Lastly, Kean Staab argues her SFIs were not deficient and to the extent they were, she has since corrected those deficiencies, rendering the penalty unreasonable.

Section 1104(a) of the Ethics Act governs SFIs and provides:

> **(a) Public official or public employee.--**Each public official of the Commonwealth shall file a [SFI] for the preceding calendar year with the [C]ommission no later than May 1 of each year that he holds such a position and of the year after he leaves such a position. Each public employee and public official of the Commonwealth shall file a [SFI] for the preceding calendar year with the department, agency, body or bureau in which he is employed or to which he is appointed or elected no later than May 1 of each year that he holds such a position and of the year after he leaves such a position. Any other public employee or public official shall file a [SFI] with the governing authority of the political subdivision by which he is employed or within which he is appointed or elected no later than May 1 of each year that he holds such a position and of the year after he leaves such a position. Persons who are full-time or part-time solicitors for political subdivisions are required to file under this section.

65 Pa.C.S. § 1104(a).

> One of the duties of the Commission is to

> [i]nspect [SFIs] which have been filed in order to ascertain whether any reporting person has failed to file such a statement or has filed a deficient statement. If, upon inspection, it is determined that a reporting person has failed to file a statement of financial interests or that any statement which has been filed fails to conform with the requirements of [S]ection 1105 (relating to statement of financial interests), then the [C]ommission shall in writing notify the person. Such notice shall state in detail the deficiency and the penalties for failure to file or for filing a deficient statement of financial interests.

65 Pa.C.S. § 1107. Pertinent here, among the required information on an SFI is

32

(1) Name, address and public position.

. . . .

(4) [t]he name and address of each creditor to whom is owed in excess of $6,500 and the interest rate thereon. However, loans or credit extended between members of the immediate family and mortgages securing real property which is the principal or secondary residence of the person filing shall not be included.

. . . .

(8) [a]ny office, directorship or employment of any nature whatsoever in any business activity.

Section 1105(b)(1), (4), (8) of the Ethics Act, 65 Pa.C.S. § 1105(b)(1), (4), (8).

In the Investigative Complaint, Kean Staab was charged with submitting deficient SFIs in her capacity as an Authority member and as an employee of the Department of Auditor General. The Investigative Complaint detailed the deficiencies for each year. (Investigative Complaint ¶ 182.) The Investigative Complaint further averred that Kean Staab filed amended SFIs numerous times and each time still did not include all of the required information or provided incorrect information. (*Id.* ¶¶ 183-85.) Kean Staab admitted these averments in her Answer to the Investigative Complaint. (Answer, ¶¶ 183-85.) Facts from the investigative complaint, which were admitted in an answer, are binding upon the Commission, which cannot make contrary findings. *Bartholomew v. State Ethics Comm'n*, 795 A.2d 1073, 1080 (Pa. Cmwlth. 2002). Based upon these admissions, the Commission found Kean Staab's SFIs for 2016 through 2020 violated the Ethics Act because she did not disclose certain details about debts, specifically the interest rate of various loans and/or credit cards, and the SFIs did not accurately reflect what positions she held or any interest she held

in any business. (FOF ¶¶ 72-74.) Those findings are supported by substantial evidence in the form of Kean Staab's admissions.

In her brief, Kean Staab argues she cured any deficiencies and makes numerous factual assertions but cites no place in the certified record for support. Our review of the certified record also reveals no such evidence to support those statements. Thus, we cannot consider them. *Paul v. Pa. Pub. Util. Comm'n*, 299 A.3d 1069, 1079 n.10 (Pa. Cmwlth. 2023).

Regardless of whether Kean Staab ultimately cured the deficiencies, which is not clear from the certified record, the Commission imposed its penalty as a result of Kean Staab's repeated failure to correct the deficiencies, which it found "show[ed] a pattern of disregard for the filing requirements imposed by statute." (Final Adjudication at 66.) Section 1109(f) of the Ethics Act empowers the Commission to "levy a civil penalty upon any person . . . who files a deficient [SFI], at a rate of not more than $25 for each day such statement remains . . . deficient. The maximum penalty payable under this paragraph is $250." 65 Pa.C.S. § 1109(f). The Commission was within its authority to impose the maximum penalty of $250 for each of the five calendar years in question.[37] Thus, we discern no error.

## IV. CONCLUSION

In summary, the Board did not have the authority to approve all of the types of expenses for which the Commission found Kean Staab liable, particularly those associated with her guests' attendance. In addition, Kean Staab's acts of voting in

---

[37] Notably, the Commission could have imposed a $250 civil penalty for the SFIs in Kean Staab's capacity as both a Board member and an employee of the Department, but reasonably declined to do so, explaining the penalty would be duplicative of the same conduct. (Final Adjudication at 66.)

favor of covering the expenses and ultimately approving the expenses, including reimbursement to herself for those expenses, constituted a conflict of interest resulting in a private, pecuniary benefit to Kean Staab. Moreover, the Commission's findings are supported by substantial evidence, except for some expenses associated with a guest's attendance at the 2017 WEFTEC. Similarly, the Commission's findings related to Kean Staab filing deficient SFIs are supported by her own admissions to that effect. Finally, the Commission acted within its authority by imposing the maximum civil penalty for Kean Staab's repeated failures to file correct SFIs.

Accordingly, the Commission's Final Adjudication is affirmed as modified.[38]

_____
RENÉE COHN JUBELIRER, President Judge

---

[38] "An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances." 42 Pa.C.S. § 706.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Valerie Kean Staab,                              :
                          Petitioner             :
                                                 :
              v.                                 :      No. 1354 C.D. 2024
                                                 :
State Ethics Commission,                         :
                          Respondent             :

# **O R D E R**

**NOW**, December 8, 2025, the Final Adjudication of the State Ethics Commission, dated September 13, 2024, is **AFFIRMED AS MODIFIED** in the foregoing opinion, to reduce the amount of restitution by $140.01.

_____
RENÉE COHN JUBELIRER, President Judge